UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Brandon Currie,                                    File No. 22-cv-839 (ECT/DJF)

                Plaintiff,

v.                                                 **OPINION AND ORDER**

Clayton Aswegan, *Elk River Police Officer*,
Brandon Martin, *Elk River Police Officer*,
and Ronnie Lawrence, *Paramedic*,

                Defendants.

_____

Nicholas Ratkowski, Ratkowski Law PLLC, St. Paul, MN, for Plaintiff Brandon Currie.

Joseph E. Flynn, Jardine, Logan & O'Brien P.L.L.P., Lake Elmo, MN, for Defendants Clayton Aswegan and Brandon Martin.

Mark R. Whitmore and Beth Louise LaCanne, Bassford Remele PA, Minneapolis, MN, for Defendant Ronnie Lawrence.

_____

On September 3, 2018, the City of Elk River Police Department received a call that Plaintiff Brandon Currie was behaving strangely inside a gas station convenience store. Two officers—Defendants Clayton Aswegan and Brandon Martin—responded. After interacting with Mr. Currie, the officers grew convinced that he was impaired and probably needed medical attention, and they called for an ambulance.

Things went sideways when the ambulance arrived. Mr. Currie tried to flee. After a short chase, the officers tackled Mr. Currie. And a paramedic—Defendant Ronnie Lawrence—injected Mr. Currie with ketamine. In this case, Mr. Currie claims through § 1983 that the officers violated his Fourth Amendment rights at various points throughout

the encounter, and he claims that paramedic Lawrence committed medical malpractice when he administered the ketamine injection.

The officers seek summary judgment against Mr. Currie's § 1983 claim, and their motion will be granted. The record evidence is undisputed in all material respects, and it shows the officers are entitled to qualified immunity. Paramedic Lawrence seeks statutory dismissal and summary judgment against Mr. Currie's medical malpractice claim. This motion will be granted because Mr. Currie's proffered expert-witness declaration is essential to the medical malpractice claim but fails Minnesota's statutory requirements.

I[1]

On September 3, 2018, a clerk working at a Holiday Stationstore in Elk River, Minnesota observed Mr. Currie acting strangely inside the store. ECF No. 49-4 at 2.[2] In his deposition, the clerk estimated he had observed Mr. Currie acting strangely for between thirty and forty-five minutes. *Id.*[3] When asked in his deposition to describe Mr. Currie's demeanor, the clerk testified that Mr. Currie was "[v]ery fidgety. He seemed to be under the influence of methamphetamine. Just wouldn't stop fidgeting with his hands, scratching his skin, sweating profusely. Just kind of looking around a lot. . . . pivoting his head a lot."

---

[1]    Unless noted otherwise, the facts are undisputed or described in a light most favorable to Mr. Currie. Fed. R. Civ. P. 56(a).

[2]    Page citations are to a document's CM/ECF pagination appearing in the upper right corner, not to a document's original pagination.

[3]    In his deposition, Mr. Currie estimated he had been in the store for between fifteen and thirty minutes before police arrived. ECF No. 50 at 21. What differences there are between the clerk and Mr. Currie's time estimates in this respect are immaterial.

*Id.*  Mr. Currie's behavior caused another employee to be "uncomfortable and kind of scared." *Id.*  The clerk telephoned police. *Id.*  During this call, the clerk described Mr. Currie's physical appearance and behavior and expressed concern that Mr. Currie appeared to be under the influence of drugs. *Id.* at 2–3.

Officers Aswegan and Martin responded to the call. ECF No. 71-1 at 15. Officer Aswegan arrived first. ECF No. 78-1 at 1.[4] He approached Mr. Currie inside the store and asked: "How's it going man? . . . You alright?" *Id.*  Officer Aswegan explained to Mr. Currie that people were concerned about him, and Officer Aswegan asked to speak with Mr. Currie outside the store. *Id.* at 1–2.

On multiple occasions soon after he encountered Mr. Currie, Officer Aswegan expressed concern that Mr. Currie was reaching into his pockets and asked Mr. Currie to stop putting his hands in his pockets. *Id.* at 2. As Officer Aswegan and Mr. Currie were exiting the store, or perhaps just after they were outside, Officer Aswegan conducted a pat-down search of Mr. Currie that revealed no weapons. *Id.*; *see* ECF No. 62-1 at 5. Officer Martin may have arrived by the time Officer Aswegan conducted the pat-down search; if not, he arrived soon after. ECF No. 78-1 at 2–3. Once outside, Officer Aswegan had Mr. Currie empty his pockets onto the ground because he did not "like seeing the bulges" in Mr. Currie's pockets and Mr. Currie kept "trying to put[] [his] hands in there."

---

[4]    Recordings from both officers' in-squad cameras captured audio of the officers' interactions with Mr. Currie, but not video. The recordings and a transcript of them were filed. *See* ECF Nos. 54 and 55 (placeholders for squad camera recordings); ECF No. 78-1 (combined transcript). The Court has reviewed the squad car recordings to confirm their contents and the transcript's accuracy. For ease of reference, just the transcript will be cited here.

*Id.* at 5–6.  The record includes no description of the items Mr. Currie removed from his pockets, but there is no suggestion any were contraband.

The officers commented several times regarding Mr. Currie's strange behavior and expressed their belief that he was under the influence of a drug or drugs.  For example, Officer Aswegan remarked: "You can't sit still, you're moving your hands, you're flipping around, your eyes are pin drops right now."  *Id.* at 7.[5]  Officer Aswegan observed that Mr. Currie had needle marks on his arm, and that they appeared to be "fresh."  *Id.* at 6.[6] The officers told Mr. Currie they believed he was "under the influence of something" and asked multiple times when Mr. Currie last used drugs.  *Id.* at 5–6.  At one point, Mr. Currie responded that it had been "a couple a weeks, a while, maybe" since he last used.  *Id.* at 6. A short time later, he stated, "I don't do drugs man."  *Id.* at 7.  Officer Martin told Mr. Currie, "I don't feel comfortable, and I don't think my partner does either[,] with you walking around on the street in this state."  *Id.* at 8.  The officers told Mr. Currie it was not illegal for him to "be on" a substance, but that if Mr. Currie refused to tell them what he was on, they would assume he had a "severe medical issue" and call an ambulance.  *Id.* at 5, 7.

---

[5]     With one exception, Mr. Currie does not seem to dispute the officers' descriptions of his behavior or appearance.  Mr. Currie incorporates the officers' descriptions at some length as allegations in his Amended Complaint.  *See, e.g.*, Am. Compl. [ECF No. 20] ¶¶ 30, 32.  The exception is that Mr. Currie denies his pupils were contracted due to drug use.  *See id.* ¶¶ 33–34.

[6]     In his deposition, Mr. Currie testified that, although he did not recall whether he had needle marks on his arms, he "wouldn't dispute it necessarily, no."  ECF No. 62-1 at 27.

After interacting with Mr. Currie in the same location for several minutes, the officers decided to move a short distance to a different location outside the store. *See id.* at 9–10. Though the record indicates the officers planned originally to relocate to "the other side of the car wash," it is not clear whether they relocated there or to a different location outside the store. *See id.* at 10. Concerned with Mr. Currie's movements, the officers directed Mr. Currie to sit on the ground or curb, and he eventually did. *Id.* at 11–12; ECF No. 50 at 21.[7] After sitting initially, Mr. Currie attempted to stand several times, and Officer Aswegen directed him to remain seated. *See* ECF No. 78-1 at 13–15. When Mr. Currie asked why he wasn't allowed to stand, Officer Aswegen explained: "Because your behavior, your movements, it's safer for you to be on the ground. My partner and I do not want to fight with you, and it's better if you're just sitting on the ground." *Id.* at 15.[8]

---

[7]    The officers described that Mr. Currie was repeatedly moving between them, pacing back and forth and clenching his fists. *See* ECF No. 78-1 at 9–11. Officer Martin warned Mr. Currie that he perceived Mr. Currie's movements as "kind of threatening behavior." *Id.* at 11. In his deposition, Officer Aswegen provided a slightly more detailed description of Mr. Currie's behavior, explaining that Mr. Currie "was clenching his fists, pacing back and forth." ECF No. 62-1 at 10. And, Officer Aswegan recounted, after Mr. Currie "would turn and face my partner, he would clench his fists and put his hands behind his back, showing a specific way like someone who was getting ready to fight . . . [and] he then would — he'd turn and face me." *Id.*

[8]    During the encounter, the officers radioed a dispatcher and requested a check on Mr. Currie's driver's license. ECF No. 78-1 at 3. Though the record is not entirely clear, subsequent radio communications appeared to show that an address associated with Mr. Currie may have been shared by a burglary suspect, *id.* at 5, that Mr. Currie was the subject of an order for protection (or "OFP"), *id.* at 7, and that Mr. Currie was on probation with "no use restrictions," *id.* at 16. No record evidence suggests these considerations caused the officers to take any particular or different action with respect to their seizure of Mr. Currie.

After Mr. Currie repeatedly denied being on substances, officers requested an ambulance. *See* ECF No. 78-1 at 14. When the ambulance arrived, Mr. Currie got up from the ground. ECF No. 50 at 22; ECF No. 78-1 at 18–19, 26. Several times, the officers directed Mr. Currie to "get down," "stay down," and "sit on the curb," and the officers threatened that if Mr. Currie did not sit down, they would "make [him] sit down." ECF No. 78-1 at 18–19. Instead of complying with the officers' commands, Mr. Currie fled. ECF No. 50 at 22. The officers chased and tackled Mr. Currie. *Id.* at 20, 24; ECF No. 62-1 at 13–14. After being tackled, Mr. Currie kicked, flailed, and resisted arrest. ECF No. 50 at 20–21; ECF No. 62-1 at 14.[9] The officers attempted to handcuff Mr. Currie but struggled to get control of his second hand. ECF No. 78-1 at 19–20; ECF No. 62-1 at 15.

Paramedic Lawrence, who by that time had arrived in the ambulance, administered 350 milligrams of ketamine intramuscularly to Mr. Currie to sedate him. ECF No. 49-2 at 3. Mr. Lawrence decided to administer ketamine based on his independent medical judgment; he was not influenced by the officers to do so. *Id.* at 5. The officers first learned that Mr. Lawrence had administered ketamine to Mr. Currie only after Mr. Currie was handcuffed. ECF No. 62-1 at 15. Mr. Currie was arrested; he was later charged with and pleaded guilty to obstruction of legal process, a gross misdemeanor. ECF No. 50 at 19.

From the time Officer Aswegan first encountered Mr. Currie to the time the officers tackled and arrested Mr. Currie, approximately twenty-five minutes had elapsed. *See* ECF

---

[9]    In his opposition brief, Mr. Currie "disputes that he was not already under control immediately upon being tackled to the ground," ECF No. 70 at 5, but in his deposition, Mr. Currie agreed he resisted, ECF No. 50 at 20–21.

No. 78-1 at 1, 18–19 (showing contact was made around 6:50 p.m. and that Mr. Currie attempted to flee just after 7:14 p.m.). Paramedic Lawrence informed the officers that Mr. Currie had to be transported to the hospital because he had been given ketamine. *Id.* at 21; ECF No. 62-1 at 15. Because Mr. Currie remained combative at the hospital, he was administered propofol and fentanyl. ECF No. 50 at 12.[10]

## II

In his operative Amended Complaint, Mr. Currie asserted thirteen counts against the City of Elk River, the Elk River Police Department, Officers Aswegan and Martin, Allina Health Medical Emergency Services, and Allina paramedic Lawrence. Under § 1983, Mr. Currie claimed that Officer Aswegan, Officer Martin, and Lawrence (1) violated his Fourth Amendment rights to be free from unlawful seizure and use of force, Am. Compl. ¶¶ 213–21, (2) violated his Fourteenth Amendment rights to due process and equal protection, *id.* ¶¶ 222–34, and (3) violated his Fourteenth Amendment rights to receive adequate medical care and to be free of bodily intrusion, *id.* ¶¶ 235–50. (4) Mr. Currie asserted a § 1983 *Monell*[11] claim against the City of Elk River. *Id.* ¶¶ 251–59. (5) Mr. Currie asserted a battery claim under Minnesota common law against Defendants Aswegan, Martin, and Lawrence. *Id.* ¶¶ 260–71. Also under Minnesota common law, Mr. Currie brought claims of (6) negligence, (7) false arrest, (8) false imprisonment,

---

[10]    In his deposition, Mr. Currie testified that he does not recall much of his time in the ambulance or the hospital; regardless, he acknowledged possessing no recollection that might contradict his medical records. ECF No. 50 at 12.

[11]    *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

(9) intentional infliction of emotional distress, and (10) negligent infliction of emotional distress against just the officers. *Id.* ¶¶ 272–313. (11) Under Minnesota common law, Mr. Currie asserted a negligent supervision claim against Allina Health and the City of Elk River. *Id.* ¶¶ 314–22. (12) Mr. Currie asserted a medical malpractice claim against Lawrence under Minnesota common law. *Id.* ¶¶ 323–31. (13) And Mr. Currie claimed under § 1983 that Defendants, or some combination of two or more of them, conspired to violate his civil rights. *Id.* ¶¶ 332–37. Mr. Currie alleges that, as the result of the arrest and ketamine injection, he has suffered many injuries. These include lost consciousness, kidney failure, a head contusion, lacerations, a bruised lung, and emotional distress, to name a few. *Id.* ¶¶ 189–202.

Defendants' summary-judgment motions prompted Mr. Currie to "waive[]" all but his § 1983/Fourth Amendment claim in Count 1 and his medical malpractice claim in Count 12. ECF No. 70 at 1. In response to Mr. Currie's waiver announcement, the parties stipulated to the with-prejudice dismissal of the City of Elk River, the Elk River Police Department, and Allina Health. ECF Nos. 79, 81. Those stipulations left only the individual Defendants remaining. Mr. Currie also stipulated to the with-prejudice dismissal of his § 1983/Fourth Amendment claim against paramedic Lawrence, leaving only the officers subject to that claim. ECF No. 79. At the hearing on Defendants' motions, Mr. Currie further narrowed his § 1983/Fourth Amendment claim, withdrawing any contention that the officers were responsible for administering ketamine and clarifying that he does not challenge the lawfulness of his arrest for obstruction of legal process. What's

left for decision, then, are the § 1983/Fourth Amendment claim against Officers Aswegan and Martin and the medical malpractice claim against Mr. Lawrence.

### III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted). A "smoking gun" is not required for the non-movant to defeat a summary judgment motion. *Teleconnect Co. v. Ensrud*, 55 F.3d 357, 360 (8th Cir. 1995). But the non-movant must show "more than mere speculation, conjecture, or fantasy." *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (citation and quotations omitted); *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019).

In determining whether the officers have qualified immunity with respect to Mr. Currie's § 1983/Fourth Amendment claim, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). A § 1983

plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes. *Id.* "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)), *cert. denied sub nom. Kong v. City of Burnsville,* --- U.S. ---, 141 S. Ct. 2839 (2021) (Mem.). If the material facts are not genuinely disputed, then the constitutionality of an officer's conduct is a question of law. *Thompson v. Reuting*, 968 F.2d 756, 759 (8th Cir. 1992); *see also Pollreis v. Marzolf*, 66 F.4th 726, 732 n.2 (8th Cir. Apr. 27, 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

Mr. Currie's § 1983/Fourth Amendment count describes the right at issue. The count is limited to claiming that Officers Aswegan and Martin violated Mr. Currie's right to be free from unreasonable seizures. Mr. Currie claims that the officers "iniated [sic] contact without having any legitimate reasonable suspicion that a crime was being committed and/or probable cause to stop or arrest [Mr. Currie]"; that they "detained and eventually arrested [him] without probable cause of any crime having been committed"; and that they "violated [Mr. Currie's] right to be free from unreasonable use of force and unreasonable seizure of his person when they tackled [Mr. Currie] and pinned him to the ground." Am. Compl. ¶¶ 214–16. In other words, Mr. Currie claims that the officers violated his Fourth Amendment right to be free from unreasonable seizures at every point in their roughly twenty-five-minute encounter—from when they initiated contact with Mr. Currie, *id.* ¶ 214, through their detention of him as they inquired regarding his condition and waited for the ambulance, *id.* ¶ 215, to when they tackled him after he fled, *id.* ¶ 216.

Begin with the second qualified-immunity question—whether the right Mr. Currie identifies was "clearly established." "For purposes of the second prong, [courts] look to 'the legal rules that were clearly established at the time' the action at issue was taken." *Graham v. Barnette*, 5 F.4th 872, 881–82 (8th Cir. 2021) (quoting *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004)). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). While Supreme Court "case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas*, U.S. at 5–6 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). As the Eighth Circuit has explained, a plaintiff can show that a right was clearly established in different ways:

> [1] A plaintiff may point to existing circuit precedent that involves sufficiently "similar facts" to "squarely govern[ ]" the officer's actions such that the officer had "notice that [his] specific use of force [was] unlawful," *Kisela v. Hughes*, 584 U.S. ---, 138 S. Ct. 1148, 1153 (2018) (per curiam), [2] present "a robust consensus of cases of persuasive authority" doing the same, *see De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017), or [3] demonstrate that a general constitutional rule applied with "obvious clarity" to the facts at issue, *see Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018).

*Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020).

Binding Fourth Amendment precedents in effect when the officers encountered Mr. Currie on September 3, 2018, distinguished traditional criminal-law-enforcement activities from police activities that "are wholly unrelated to a desire to prosecute for crime." *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014) (quoting *Terry v. Ohio*, 392 U.S. 1, 13 (1968)).  Police activities fall in the latter, so-called "community caretaking" category if they are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).  In *Harris*, the Eighth Circuit described the rules applicable to searches and seizures in the community-caretaking context as follows:

> A search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the "governmental interest in the police officer's exercise of [the officer's] 'community caretaking function,'" "'based on specific articulable facts,'" outweighs "'the individual's interest in being free from arbitrary government interference.'" *Samuelson* [*v. City of New Ulm*], 455 F.3d [871,] 877 [(8th Cir. 2006)] . . .  The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop. *See* [*United States v.*] *Garner*, 416 F.3d [1208,] 1213 [(10th Cir. 2005)]; *see also United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013) ("While officers should employ the least intrusive means reasonably available to verify or dispel their suspicions, they may take any additional steps that are 'reasonably necessary to protect their personal safety . . . during the course of the stop.'" (alteration in original) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985))).
>
> One situation in which an officer may act under the community caretaker doctrine is when "the officer has a reasonable belief that an emergency exists requiring his or her attention." *Burke* [*v. Sullivan,*] 677 F.3d [367,] 371 [(8th Cir. 2012)] (internal

quotation marks omitted); *see, e.g.*, [*United States v.*] *Quezada*, 448 F.3d [1005,] 1007 [(8th Cir. 2006)] (holding that a warrantless entry into a home was reasonable because "a reasonable officer in the deputy's position could conclude that someone was inside but was unable to respond for some reason"); *Winters* [*v. Adams*], 254 F.3d [758,] 764 [(8th Cir. 2001)] (holding that a seizure without suspicion was reasonable because allowing a "possibly intoxicated individual to drive [a] vehicle" created a serious risk to the public). When police must make a split-second decision in the face of an emergency to either stand idly by, permitting a dangerous situation to continue uninterrupted, or act, addressing the potential danger to protect the public, we have reasoned that officers are expected to act. *See, e.g.*, *Samuelson*, 455 F.3d at 877–78; *Winters*, 254 F.3d at 764.

*Harris*, 747 F.3d at 1017–18.[12]

Here, the undisputed material facts establish that the officers' suit-provoking activities with respect to Mr. Currie fell in the non-criminal-law-enforcement/community-caretaking category, at least until Mr. Currie attempted to flee. The call to which the officers responded was not criminal in nature. The Holiday Stationstore clerk called to report only that Mr. Currie was behaving strangely. ECF 49-4 at 2. The clerk did not

---

[12]    In *Caniglia v. Strom*, the Supreme Court explained that the community-caretaking exception is not a "standalone doctrine that justifies warrantless searches and seizures in the home." 593 U.S. 194, 196 (2021). Prior to *Caniglia*, however, "it was well established in [the Eighth Circuit] that the community-caretaking exception was a standalone doctrine that alone could justify warrantless entry into a home[,]" among other non-investigatory police activities. *Graham v. Barnette*, 5 F.4th 872, 882 (8th Cir. 2021). Also of note, the Eighth Circuit concluded in *Graham* "that probable cause of dangerousness is the standard that must be met for a warrantless mental-health seizure to be reasonable under the Fourth Amendment." *Id.* at 884. However, owing to ambiguity in the Eighth Circuit's precedents preceding *Graham*, the court also concluded that the probable-cause standard was not clearly established before then, meaning "the more lenient reasonable-belief standard that some . . . precedents had suggested was the requisite standard governing warrantless mental-health seizures" applies to answer the second qualified-immunity question here. *Id.* at 887.

report, for example, that Mr. Currie had shoplifted or engaged in any other activity that might be considered criminal in nature. *See id.* When the officers arrived, they focused on determining whether Mr. Currie was under the influence or perhaps impaired for some other reason and whether he might require medical attention. The first words Officer Aswegan spoke to Mr. Currie included asking whether he was "alright." ECF No. 78-1 at 1. And the officers' subsequent conversations with Mr. Currie reflect only this non-investigatory objective. Several times the officers asked Mr. Currie what drug or drugs he had taken. *See id.* at 5–8. The officers expressed concern with Mr. Currie "walking around on the street in this state." *Id.* at 8. And the officers repeatedly reminded Mr. Currie that it was not illegal for him to "be on" a substance. *Id.* at 5. In other words, the undisputed facts show that the officers' activities with respect to Mr. Currie were non-investigatory and fell within their community-caretaking function.[13]

The undisputed material facts show that the officers' actions met the community-caretaker doctrine's standards. The store clerk's call and report, combined with Mr. Currie's behavior and impaired condition, gave the officers specific articulable facts to seize Mr. Currie to determine whether he might require medical attention and to assess

---

[13]    For this case's purposes, Officer Aswegan's pat-down of Mr. Currie did not transform the encounter with Mr. Currie into a criminal-law-enforcement activity. The Amended Complaint does not ground the § 1983/Fourth Amendment claim on the pat-down. *See* Am. Compl. ¶¶ 213–21. If it did, the pat-down was quite brief, justified as a response to Mr. Currie continuing to reach into his pockets, and it led to no discovery of weapons, contraband, or other criminal activity. The same is true regarding the dispatch reports the officers received regarding Mr. Currie, including the existence of an order for protection and Mr. Currie's supervision conditions. These reports did not prompt the officers to engage in investigatory procedures; the reports did not focus the officers away from Mr. Currie's condition and possible need for medical attention.

whether, or to what degree, he might pose a danger to the public. Mr. Currie's subsequent behavior and his responses to the officers' questions gave the officers further reason to prolong the seizure and call the ambulance. The undisputed facts show that Mr. Currie was behaving strangely, and his refusal to definitively answer whether he had ingested a drug or drugs (not to mention what drug or in what quantity) left the officers to make a prompt judgment about Mr. Currie's need for medical attention and the potential risks he posed to the public. Weighed against these considerations is Mr. Currie's "interest in being free from arbitrary government interference." *Harris*, 747 F.3d at 1017 (quotation omitted). But it is difficult to understand how the officers' actions might conceivably be considered arbitrary. In light of his behavior, evident impairment, and refusal to directly answer the officers' questions, Mr. Currie should have reasonably expected the sort of intrusions necessary to provide him with medical attention. *Cf. United States v. Conley*, 69 F.4th 519, 524 (8th Cir. 2023).[14]

The officers' tackling of Mr. Currie raises a different question. For his attempt to flee and physically resist arrest after he was tackled, Mr. Currie was later charged with, and pleaded guilty to, obstructing legal process in violation of Minn. Stat. § 609.50, subdiv. 1(2); *see* ECF No. 62-1 at 48–58. As part of his guilty plea, Mr. Currie admitted running from the officers, ECF No. 62-1 at 54, and kicking at the officers and resisting

---

[14]   Other courts have reached this same conclusion on comparable facts—that is, cases involving calls to police regarding possibly impaired individuals in or near retail stores. *See, e.g.*, *United States v. Mason*, No. 21-3225, 2022 WL 853304, at *3–5 (6th Cir. March 22, 2022); *United States v. Lewis*, 869 F.3d 460, 462–64 (6th Cir. 2017); *United States v. Peoples*, No. 13-CR-0141-CVE, 2013 WL 4521174, at *2–3 (N.D. Okla. Aug. 26, 2013).

arrest after he was tackled, *id.* at 55.  From the moment Mr. Currie fled, then, the officers'

actions were related to the violation and enforcement of a criminal statute, and they ceased

to act in their community-caretaking capacity.  *Harris*, 747 F.3d at 1017.  Regardless, case

law shows that the officers' actions in this respect did not violate a clearly established right.

*See McVay v. Sisters of Mercy Health Sys.*, 399 F.3d 904, 906, 907–09 (8th Cir. 2005)

(finding no Fourth Amendment violation where officer tackled fleeing individual who

officer believed may have been under the influence of an unknown substance and who

"was disoriented and exhibiting signs of lacking mental control"); *see also VanPelt v. City

of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023) ("[W]hen a suspect flees, police may use force

to subdue him.").

Mr. Currie argues that genuine fact disputes exist as to whether the officers violated

a clearly established right, *see* ECF No. 70 at 23–29, but his arguments are not persuasive.

(1) Mr. Currie argues that the officers could not have acted in their community-caretaking

function because they ultimately charged Mr. Currie with obstructing justice.  *Id.* at 25.  It

is true he was charged with obstruction, but the circumstances leading to that charge arose

only upon Mr. Currie's attempt to flee.  The undisputed material facts cannot be reasonably

understood or construed to show that the officers were acting in a criminal-investigatory

capacity before Mr. Currie attempted to flee.  (2) Citing to Officer Aswegan's deposition

testimony, Mr. Currie argues that at least Officer Aswegan believed he was investigating

criminal activity from the moment he arrived and encountered Mr. Currie.  *Id.* at 25–26.

Officer Aswegan's testimony cannot reasonably be construed to support this contention.

Consider just the first section of deposition testimony Mr. Currie cites:

Q. Did the clerks report that they were worried that he was stealing stuff?

A. No.

Q. Did you see that he had stolen anything when you approached him?

A. No.

Q. And you didn't see any weapons on him when you approached before you did the pat down?

A. No, I did not.

Q. So what crime did you think he was committing at that point?

A. At that point in time, we were making contact with him due to his irregular behavior and asking him to leave. All told, my concern when I considered talking to him was his behavior. He did not appear to be in his right mind and he was not wanted at the Holiday gas station, so we were assisting the clerks in that sense to remove him for trespassing.

Q. Is it a crime not to be in your right mind?

A. No, it is not.

Q. Is it a crime to have ingested controlled substances?

A. It is not.

Q. Is it a crime to be under the influence of controlled substances?

A. Ingest -- you're saying that in the same sense as far as ingesting it?

Q. Similarly, but there are other ways to be under the influence.

17

A. No.

Q. So did you cite him for trespass at any point?

A. No.

Q. Did you write anything in your report about a trespass at any point?

A. I don't recall.

Q. So what exactly was your goal when you started talking to Mr. Currie?

A. I think it was very apparent that Mr. Currie was not able to take care of himself or care for himself at that point in time.

Q. And what made that apparent?

A. His inability to remain still; as far as his responses, not being able to understand what he was saying; his behavior in the store as far as rearranging the store for the employees and causing fear to people in the business, I guess at that point is what was concerning.

ECF No. 71-1 at 26–28. This testimony does not show that Officer Aswegan was investigating a criminal violation; it confirms Officer Aswegan was acting in a community-caretaking function when he encountered Mr. Currie. The officer was clear that his concerns were Mr. Currie's well-being (because Mr. Currie "was not able to take care of himself or care for himself at that point in time") and alleviating the fear Mr. Currie caused to persons in the store. Officer Aswegan's reference to "trespassing" in one of his answers doesn't change things. Mr. Currie was not charged with trespassing. Nothing about Officer Aswegan's encounter with Mr. Currie indicates or implies the officer investigated or cared about the possibility that Mr. Currie had criminally trespassed. And earlier in his

deposition, when asked whether he would say that Mr. Currie "was trespassing in the store," Officer Aswegan answered: "I would say he wasn't wanted there by the employees." ECF No. 71-1 at 23. The record shows that, when Officer Aswegan asked, Mr. Currie left the store.

It is significant that Mr. Currie does not seek to show a clearly established right in the usual way. He cites no then-existing Eighth Circuit precedent involving sufficiently similar facts that would have put the officers on notice that their use of force—or some particular aspect of it—was unlawful. He identifies no robust consensus of persuasive authority doing the same thing. Though he cites a series of cases describing Fourth Amendment rights generally, Mr. Currie does not explain how these general Fourth Amendment rules (or one of them) plainly applied to—and were obviously violated on— this case's facts. *See* ECF No. 70 at 23–29; 44–45. Mr. Currie distinguishes two cases the officers cited for the proposition that no constitutional violation occurred—*Winters v. Adams*, 254 F.3d 758 (8th Cir. 2001), and *Powell v. Staycoff*, No. 17-cv-03018 (ECT/SER), 2019 WL 2524771 (D. Minn. June 19, 2019). Mr. Currie does not explain how the distinctions he identifies between these two cases and this case show the violation of a clearly established right, and it is difficult to conceive how they might.

Mr. Currie's § 1983 claim is not submissible because the material facts are not genuinely disputed, and they show the officers did not violate a Fourth Amendment right that was clearly established on September 3, 2018. The officers therefore have qualified immunity, and their summary-judgment motion will be granted.

IV

The disputed issues regarding Mr. Currie's medical malpractice claim against paramedic Lawrence concern the sufficiency of the expert affidavit Mr. Currie served under Minnesota's expert-review statute, Minn. Stat. § 145.682, and whether, if the expert's affidavit complied with that statute, it establishes the trial-worthiness of the medical-malpractice claim.

In an effort to comply with the statute, Mr. Currie served the affidavit of A. Keith Wesley, M.D.  ECF No. 38.  Dr. Wesley is the Medical Director of United Emergency Medical Response in Wisconsin Rapids, Wisconsin.  *Id.* at 7.  He is board certified in emergency medicine, a fellow of the American College of Emergency Physicians, and holds sub-specialty certifications in emergency medicine and emergency medical services (or "EMS").  *Id.*  Dr. Wesley's ultimate opinion is that "Lawrence breached his duty of care with respect to [Mr. Currie] and thereby caused injury to [Mr. Currie.]"  *Id.* ¶ 4.

To prevail on a medical malpractice claim under Minnesota law, a plaintiff must establish "(1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct, (2) that the defendant in fact departed from that standard, and (3) that the defendant's departure from the standard was a direct cause of [the plaintiff's] injuries."  *Plutshack v. Univ. of Minn. Hosps.*, 316 N.W.2d 1, 5 (Minn. 1982). And, under Minnesota's expert-review statute, a medical malpractice plaintiff whose claim depends on expert testimony to establish a *prima facie* case must, "within 180 days after commencement of discovery," serve an affidavit

20

signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Minn. Stat. § 145.682, subdivs. 1, 2, 4(a); *see Wesely v. Flor*, 806 N.W.2d 36, 39–40 (Minn. 2011) (summarizing statute); *Flores v. United States*, 689 F.3d 894, 899–900 (8th Cir. 2012) (same).[15]   A failure to comply with these requirements "results, upon motion, in mandatory dismissal with prejudice . . . provided" the motion identifies the affidavit's claimed deficiencies, the hearing on the motion occurs "at least 45 days from the date of service of the motion[,]" and "before the hearing on the motion, the plaintiff does not serve upon the defendant an amended affidavit or answers to interrogatories that correct the claimed deficiencies."  Minn. Stat. § 145.682, subdiv. 6(c).[16]

Here, Lawrence's motion identified the affidavit's claimed deficiencies, *see* ECF No. 61 at 16–20, and was served more than forty-five days before the hearing, *see* ECF Nos. 59 (showing motion was served October 5, 2023), 83 (showing hearing occurred January 8, 2024).  And nothing in the record shows that Mr. Currie served an amended

---

[15]    Mr. Currie does not argue that he may pursue his medical-malpractice claim—the whole thing or any part of it—without expert testimony.  *See* ECF No. 70 at 32–38.

[16]    The Minnesota Supreme Court has said that a dismissal under Minn. Stat. § 145.682, subdiv. 6, is "a statutory dismissal for procedural reasons and not a summary judgment." *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 189 n.1 (Minn. 1990).  The distinction seems academic here because the relevant facts—*i.e.*, the content of the challenged affidavit—are not disputed.  The question is whether the affidavit's undisputed contents meet the statute's requirements.

affidavit or interrogatory answers addressing the claimed deficiencies. In other words, the only question to be answered is whether the affidavit contains the content—particularly as to the "substance" and "summary of the grounds" of the expert's opinions—required by Minn. Stat. § 145.682, subdiv. 4(a).

The Minnesota Supreme Court has addressed the statute's substance and summary-of-the-grounds requirements in several cases, and several principles emerge from these cases. A medical malpractice plaintiff must strictly comply with the statute. *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 726 (Minn. 2005). The affidavit must "(1) disclose specific details concerning the expert's expected testimony, including the applicable standard of care, (2) identify the acts or omissions that the plaintiff alleges violated the standard of care, and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages." *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002); *see Sorenson*, 457 N.W.2d at 193 (same). "Under Minnesota case law, the affidavit cannot be conclusory or abstract." *Mathison v. United States*, 44 F. App'x 27, 29 (8th Cir. 2002) (quoting *Sorenson*, 457 N.W.2d at 193); *see Stroud v. Hennepin Cnty. Med. Ctr.*, 556 N.W.2d 552, 556 (Minn. 1996) (rejecting affidavit that "provide[d] only broad, conclusory statements as to causation" and "[did] not provide an outline of the chain of causation between the alleged violation of the standard of care and the claimed damages"). It seems clear from the Minnesota Supreme Court's cases that a careful, case-specific analysis of the expert's affidavit is ordinarily necessary to answer whether the affidavit meets § 145.682, subdiv. 4(a)'s substance requirements.

*See Teffeteller*, 645 N.W.2d at 424–25, 429; *Anderson v. Rengachary*, 608 N.W.2d 843, 845, 848 (Minn. 2000).

In his affidavit, Dr. Wesley described several standards of care and the acts or omissions that he claimed violated each standard. According to Dr. Wesley: (1) "Lawrence had a duty to use the least level of restraint when restraining [Mr. Currie]. Ketamine is typically the highest level of restraint available." ECF No. 38 ¶ 5. (2) Because Mr. Currie was physically restrained and under the officers' control when Lawrence arrived, there was no need to administer ketamine and "Lawrence breached his duty of care by administering ketamine . . . for the purpose of gaining behavioral compliance." *Id.* ¶ 6. (3) Ketamine should be administered only when "a patient is severely or profoundly agitated," and because Mr. Currie was not severely or profoundly agitated, "ketamine was not indicated and should not have been administered[.]" *Id.* ¶¶ 7–9. (4) "Lawrence had a duty to evaluate [Mr. Currie] before administering ketamine." *Id.* ¶ 15. But the facts—particularly the brief time between Lawrence's arrival and decision to administer ketamine to Mr. Currie—do not show that Lawrence evaluated Mr. Currie. *Id.* ¶¶ 13–15. (5) Finally, "Lawrence had a duty to keep accurate medical records and not falsify medical records." *Id.* ¶ 16. He breached this duty by including content in Mr. Currie's records suggesting he "adequately evaluated" Mr. Currie before administering ketamine. *Id.*

Dr. Wesley's disclosure in these respects—that is, of the applicable standards of care and the acts or omissions that violated these standards—is sufficient. He identified several standards and corresponding acts or omissions on paramedic Lawrence's part that violated each standard. Dr. Wesley's affidavit could be faulted for not identifying a source

or sources of authority showing that the standards of care he identified are "recognized by the medical community as applicable to [Mr. Lawrence's] conduct." *Tousignant v. St. Louis Cnty.*, 615 N.W.2d 53, 59 (Minn. 2000). But no case applying § 145.682, subdiv. 4(a) seems to require that. *Cf. Teffeteller*, 645 N.W.2d at 424–25, 429 (finding affidavit non-compliant with respect to causation, not as to its description of the standards of care).

Dr. Wesley's "outline of the chain of causation between the violation of the standard of care and the plaintiff's damages," *id.* at 428, is less robust and deserves close analysis. Dr. Wesley seems to outline his causation opinions in five paragraphs: (1) Dr. Wesley states generally that "Lawrence breached his duty of care with respect to [Mr. Currie] and thereby caused injury to [Mr. Currie]." ECF No. 38 ¶ 4. (2) Dr. Wesley opines that the administration of ketamine to Mr. Currie "caused him to enter a state of severe or profound agitation." *Id.* ¶ 10. (3) Dr. Wesley states that Mr. Currie's intubation on arriving at the hospital was necessary because Mr. Currie was comatose; in Dr. Wesley's opinion, Mr. Currie "was comatose because he was over sedated with ketamine." *Id.* ¶ 12. (4) Dr. Wesley opines that Mr. Lawrence "caused [Mr. Currie] to experience numerous injuries as a result of breaching his duties of care. These injuries include severe mental anguish, apneic episodes, injuries arising from intubation, acute respiratory failure, delirium, encephalopathy, and respiratory acidosis." *Id.* ¶ 17. (5) Dr. Wesley opines that Mr. Lawrence and the officers share responsibility for some of Mr. Currie's injuries. Dr. Wesley explains:

> Defendant Lawrence likely shares partial responsibility for [Mr. Currie's] moderate pneumomediastinum and bilateral subcutaneous emphysema. These injuries often occur as a result of physical restraint and may be partially attributable to the Defendant police officers. These injuries can also be caused or aggravated by screaming hard while an airway is restricted. To the extent [Mr. Currie] was screaming because of the effects of the ketamine, such injuries may be partially attributable to Defendant Lawrence.

*Id.* ¶ 18.

Two of Dr. Wesley's causation-directed statements—the statements described in (1) and (4), above—are generic and conclusory and do not contribute to satisfying § 145.682, subdiv. 4(a)'s substance requirements. The statement in ¶ 4 could be asserted on behalf of any medical malpractice plaintiff. The assertions in ¶ 17 describe injuries specific to Mr. Currie, but nothing in the paragraph tethers those injuries to Mr. Lawrence other than through the conclusory assertion that he "caused" them. That is not sufficient. *Stroud*, 556 N.W.2d at 556 (noting that "broad, conclusory statements as to causation" do not meet the statute's requirements). Two other of Dr. Wesley's causation-directed assertions describe consequences Mr. Currie experienced from being administered ketamine—*i.e.*, that he became severely agitated and was intubated. ECF No. 38 ¶¶ 10, 12. It is not obvious that either of these occurrences is an "injury" in the relevant sense. Agitation is a state of mind and intubation is a medical procedure.[17] Regardless, if these were injuries, in ¶ 18 of the

---

[17]    In ¶ 17, Dr. Wesley did not identify "agitation" as one of Mr. Currie's injuries, though he did list "severe mental anguish" and "delirium." Perhaps Dr. Wesley intended to equate agitation with one or both injuries. In the same paragraph, he did not identify intubation alone as an injury, but rather "injuries arising from intubation," though he did not identify what those intubation-related injuries were. *See* ECF No. 38 ¶ 17.

affidavit, Dr. Wesley acknowledges that the officers "likely share[d] partial responsibility for" Mr. Currie's injuries. He did not, however, outline any opinion apportioning causation between paramedic Lawrence and the officers. Nor did he outline a method a factfinder might employ to answer the apportionment question. The absence of this information makes Dr. Wesley's affidavit comparable to the affidavit the Minnesota Supreme Court rejected in *Anderson*. There, the proffered expert's use of the phrase "undetermined etiology" suggested that the cause of the plaintiff's injury was unknown and perhaps unrelated to the defendant's conduct. 608 N.W.2d at 848. For this reason, the court determined that the expert "failed to adequately describe the alleged negligence on the part of [the defendant] and its relationship to [the plaintiff's] injury." *Id.* Dr. Wesley's affidavit presents a variation on that theme. He attributed "likely" causation to persons other than Mr. Lawrence, but the lack of any apportionment opinion means the affidavit fails to describe what negligence on Mr. Lawrence's part caused Mr. Currie's injuries. To put it another way, Dr. Wesley does not "set out how" he will use this case's facts "to arrive at" a causation opinion as to Mr. Lawrence. *Sorenson*, 457 N.W.2d at 192–93.

Dr. Wesley's affidavit fails to comply with Minn. Stat. § 145.682, subdiv. 4(a), as the Minnesota Supreme Court has construed the statute. For that reason, and because Dr. Wesley's testimony is essential to Mr. Currie's medical malpractice claim (Dr. Wesley is Mr. Currie's only expert), the claim must be dismissed pursuant to § 145.682, subdiv. 6(c).

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendants Clayton Aswegan and Brandon Martin's Motion for Summary Judgment [ECF No. 45] is **GRANTED**.

2.      Defendant Ronnie Lawrence's Motion for Summary Judgment and/or Dismissal [ECF No. 59] is **GRANTED**.

3.      The Amended Complaint [ECF No. 20] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  March 11, 2024                          s/ Eric C. Tostrud
                                               Eric C. Tostrud
                                               United States District Court